Builders Steel Company v. Commissioner.
Builders Steel Co. v. Commissioner
Docket No. 17796.
United States Tax Court
1949 Tax Ct. Memo LEXIS 232; 8 T.C.M. (CCH) 296; T.C.M. (RIA) 49069; March 25, 1949
John H. McEvers, Esq., G. Lee Burns, Esq., Reece A. Gardner, Esq., 201 First Nat'l Bank Bldg., Kansas City 6, Mo., and John W. Rader, C.P.A., 1419 Commerce Bldg., Kansas City, Mo., for the petitioner. Frank M. Cavanaugh, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: The respondent determined the following deficiencies in income and excess profits taxes of petitioner: Income
Excess
Year
Tax
Profits Tax
1942
$771.83
$18,465.44
1943
65.51
21,075.70
1944
119.71
20,868.80
The sole issue is whether or not the respondent erred in disallowing a portion of deductions for compensation paid petitioner's officers for the years 1942 to 1944, inclusive. Petitioner claims that it overpaid its excess profits taxes for the taxable years involved in *233 the amount of $1,540.51. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner, a Missouri corporation, was organized on September 23, 1927. Its organizers were Karl W. Schmidt, Bernard C. Zwart, Herbert G. Herrmann, C. P. Schmidt and Willa K. Schmidt. It maintained its principal place of business in North Kansas City, Mo., and engaged in the business of fabricating and selling structural steel and miscellaneous steel and iron products. It kept its books and filed its returns on the basis of the calendar year and upon the accrual method. Its returns for the taxable years were filed with the collector of internal revenue for the sixth district at Kansas City, Missouri. The stockholders of petitioner and the number of shares owned by each during various periods from January 1, 1936, to December 31, 1944, inclusive, were as follows: Jan. 1, 1936
Jan. 2, 1937
Mar. 31, 1937
Jan. 3, 1938
to
to
to
to
Jan. 1, 1937
Mar. 30, 1937
Jan. 2, 1938
Dec. 31, 1944
Karl W. Schmidt
110
110
310
392 1/2
Herbert G. Herrmann
60
60
130
162 1/2
Bernard C. Zwart
60
60
130
162 1/2
John H. Collopy
1
30
37 1/2
Willa K. Schmidt
(sister of
Karl W. Schmidt)
10
10
10
10    C. P. Schmidt
(father of
Karl W. Schmidt)
10
10
10
10    Totals
250
251
620
775    *234 From the time of the organization of petitioner in 1927 to and including the year 1936, its officers were Karl W. Schmidt, president, Herbert G. Herrmann, vice president, and Bernard C. Zwart, secretary and treasurer. The only change during the years 1937 to 1944, inclusive, was that Bernard C Zwart served as treasurer only and John H Collopy served as secretary. The salaries and bonuses paid by petitioner to its officers during the years 1928 to 1944, inclusive were as follows: Schmidt
Herrmann
Zwart
Collopy
Year
Salary
Bonus
Salary
Bonus
Salary
Bonus
Salary
Bonus
1928
$ 7,483.11
$ 7,937.15
$ 5,200
$ 1,875
1929
15,000.00
10,000.00
10,000
2,500
1930
15,000.00
10,000.00
10,000
2,600
1931
10,000.00
7,500.00
7,500
2,600
1932
4,050.00
4,050.00
4,050
2,400
1933
1,280.00
1,280.00
1,280
1,845
1934
2,600.00
2,600.00
2,600
3,050
1935
5,200.00
5,200.00
5,200
3,120
1936
15,000.00
10,000.00
10,000
5,000
1937
15,000.00
10,000.00
10,000
5,000
1938
12,000.00
8,000.00
8,000
5,000
1939
5,000.00
5,000.00
5,000
5,000
1940
9,000.00
8,000.00
8,000
8,000
1941
13,000.00
$6,500
10,000.00
$5,000
10,000
$5,000
10,000
5,000
1942
17,500.00
6,500
12,500.00
5,000
12,500
5,000
10,000
5,000
1943
17,500.00
6,500
12,500.00
5,000
12,500
5,000
10,000
5,000
1944
17,500.00
6,500
12,500.00
5,000
12,500
5,000
10,000
5,000
*235 In its returns for the years 1942 to 1944, inclusive, the petitioner claimed as deductions the amounts paid to each of its officers for salaries and bonuses, as shown above. The respondent determined that reasonable compensation for the services rendered by these officers in each of these years was $15,500 for Schmidt, $12,000 for Herrmann, $12,000 for Zwart, and $10,000 for Collopy, and disallowed as deductions the remainder of the amounts paid to these officers. Karl W. Schmidt was born in Kansas City, Mo., in 1892. He received his high school education in Kansas City, Mo., and was graduated from the University of Illinois in 1916 with a B. S. DEGREE IN ARCHITECTURAL ENGINEERING. After his graduation he was employed in turn by Kansas City Structural Steel Co. at Kansas City, Mo., the Empire Electric Co. at Joplin, Mo., and the Kansas City Power & Light Co. at Kansas City, Mo. In 1919 he then left the Kansas City Power & Light Co. to accept a position with J. Goldberg & Sons Structural Steel Co. of Kansas City, Missouri. He started as chief draftsman in the engineering department at $200 a month and worked his way up until he became general superintendent and manager of the entire *236 plant. In 1927 J. Goldberg & Sons Structural Steel Co. went into bankruptcy. At that time Mr. Schmidt was drawing a salary of $480 a month, or $5,700 a year. Bernard C. Zwart was born on December 30, 1886. He left high school in 1908 after three and one-half years' attendance. After leaving school he was first employed for about one year as an apprentice draftsman and he continued to work as a draftsman in the same position for about eighteen months. He then went to Trinidad, Colo., where he worked as an architectural draftsman for about a year and a half. He then spent about a year with a general contractor as a sort of straw boss. His next position was with a foundry in Trinidad, Colo., where he did drafting work and began working in steel. After Mr. Zwart found out what he wanted to do he completed a correspondence school course in engineering. From Trinidad he went to Los Angeles and worked for the Baker Iron Works, first as a structural draftsman and then as an estimator of structural steel framework. After about a year he returned to Kansas City and went to work for John E. Lohr Steel & Iron Works, and in that position his duties consisted of estimating small ornamental iron *237 and steel jobs. In 1916 he went with J. Goldberg & Sons Structural Steel Co. as head of the structural steel drafting room. Later he went into the sales department where his work consisted of selling to general contractors and estimating. He held that position and was receiving $100 a week, plus a bonus of from $300 to $900 a year ($5,500 to $6,100 a year) when the Goldberg firm closed its doors in 1927. Herbert G. Herrmann was born July 13, 1895. He started to work at the age of fourteen, after finishing grade school. His first job was with Bucyrus Steel Shovel Co. at Evansville, Ind. He worked there four years, during which time he assisted in laying out structural and miscellaneous steel. His next work was with J. Goldberg & Sons Structural Steel Co. in Kansas City, Mo., and he remained with that company until 1918 when he went with the Sheffield Steel Co. in Kansas City, where he did steel framebuilding work. In 1920 he returned to J. Goldberg & Sons Structural Steel Co. where he advanced until he became plant superintendent in charge of operations in the fabricating shop. He was earning $70 a week, plus a $60 a month bonus (about $4,360 a year), when the plant closed its doors *238 in 1927. J. H. Collopy was born in Ohio in 1902. He received a grade school and business college education. After graduating from school he went to work with J. I. Case Plow Works as assistant cashier. In about 1923 he left that position and started to work for the J. Goldberg & Sons Structural Steel Co. as timekeeper, cost accountant and material clerk. He remained in that position until the Goldberg Company closed its doors in 1927, at which time he was earning $35 a week ($1,820 a year). He then went with Gleaner Harvester Corporation for a short time and joined petitioner inoctober 1927. When it became apparent that J. Goldberg & Sons would not reopen, Schmidt, Zwart and Herrmann decided to start a structural steel business of their own, and organized the petitioner in September 1927. Of the $25,000 capital with which the company opened business, Schidt paid in $11,000, Herrmann and Zwart each paid in $6,000, and Schmidt's father and sister each contributed $1,000. Petitioner acquired a plant and began business in North Kansas City, and has continued to carry on business at this location to and including the taxable years. Prior to the war its business was unique in that *239 it not only fabricated structural steel, but also fabricated and sold ornamental and miscellaneous iron products while its competitiors confined their business either to the fabrication and selling of structural steel or to the fabrication and selling of ornamental and miscellaneous iron products. As a part of the sales price petitioner furnished its customers with architectural and structural engineering services and advice. During the war years the business of the petitioner was confined largely to fabricating and selling structural steel. During the years 1940 and 1941 petitioner worked one shift of from 40 to 44 hours a week. During 1942 it worked two shifts for approximately nine months, one shift from 7:30 a.m. to 4:30 p.m. and the other from 5:00 p.m. to 2:00 a.m. During the latter part of 1942 and during 1943 and 1944, petitioner reverted to one shift of 53 hours a week. The tonnage shipped by petitioner jumped from 1,839 in 1939 to 2,324 in 1940, to 4,861 in 1941, and to 4,255 in 1942. Most of petitioner's products during the taxable years were for projects related either directly or indirectly to the war effort. Schmidt was president and overall manager of petitioner's *240 business, and in addition thereto he handled engineering problems, structural engineering work, and had charge of plant maintenance. He often had to go out on the job and obtain necessary engineering data. When, as sometimes happened, jobs came to petitioner without architectural designs Schmidt blocked out the designs and his assistants filled in the details. Schmidt always checked the major contracts with Zwart, both as to price and as to time, and in the absence of Herrmann he took charge of production, and in the absence of Zwart he took charge of estimating costs. During the years 1942 to 1944, inclusive, Schmidt went to work between 7:30 and 8:00 in the morning and often worked as late as 8:00 or 9:00 p.m. with time off for meals. He worked all day on Saturdays and eight hours on Sundays and holidays. During the war he spent about 75 per cent of his time in production work and 25 per cent was devoted to executive duties. The highest paid man who worked under Schmidt was the head draftsman who received compensation of $6,090.97 in 1942, $6,445.01 in 1943 and $6,486.52 in 1944. He is a graduate of the University of Kansas and has a Bachelor of Science degree in engineering. *241 Zwart was petitioner's treasurer in charge of sales, outside contracts, labor relations, banking and the erection of materials. He procured contracts, designed layouts, and figured out the best way to do the job. Where a job was complicated he would confer with Schmidt and Herrmann. Because of the need for steel products in connection with the war effort, very little sales solicitation was required during the taxable years. There were, however, many unexpected and unusual requirements and more different kinds of buildings and layouts than in normal times. Price and time were essentials in the wartime bids and Zwart had to contract for jobs just as he did before the war. Many complications arose and he had to watch priorities and at times had to assist in getting them. Zwart also handled labor problems, contracts with labor unions, and he and Collopy handled all applications to the War Labor Board. When he had four or five jobs he would go to erection work before going to the office. He often went to contractors' homes at night, on Sundays and on holidays and helped lay out the structural steel. Prior to the war he very seldom worked on Sundays but always had been in the habit *242 of working on Saturday morning and a few hours on Saturday afternoons. He always worked long hours and never confined himself to 40 or 50 hours a week. If he had work to do he did it if it took him until 9:00 or 10:00 o'clock at night. In 1942 he stated work at 7:30 in the morning and always worked until 5:30 and at night. He always worked on Saturdays and Sundays during the war years. On Saturdays he worked until about 4:00 p.m. and on Sundays from 9:00 to 12:00 or 1:00. During the years 1942 to 1944, inclusive, he took no vacation. The highest paid man who worked under Zwart received compensation of $4,480 in 1942, $4,891.82 in 1943, and $4,885.90 in 1944. Herrmann was vice president in charge of plant production and shop personnel. Plant production consisted of the fabrication of the steel and the ornamental and miscellaneous iron according to the architect's designs and with close precision as to measurements, stress and tensile strength. While petitioner was working two shifts in 1942 Herrmann started work at 7:30 a.m. and worked until the first shift went off in the afternoon and then stayed on and worked with the second shift, sometimes as late as 8:00 or 9:00 p.m. During *243 that part of 1942, 1943 and 1944 when petitioner operated one shift, Herrmann worked from 7:30 a.m. until the plant closed and then worked 2 or 3 hours overtime to map out and arrange his work for the next day. He worked all day Saturday and from 7:30 to 4:00 on some Sundays. He took no vacation during the years 1942 to 1944. The highest paid man working under Herrmann during the years 1942 to 1944 received compensation of $3,223.88 in 1942, $3,889.18 in 1943 and $3,615.66 in 1944. Collopy was petitioner's secretary, office manager, and purchasing agent in charge of accounting, collections and traffic. From 1942 to 1944 he went to work at 8:00 a.m. and left at 5:30 p.m. He generally went back in the evenings and worked until 9:00 p.m. On evenings when he did not return to the office he generally took work home with him. He worked all day on Saturdays and from 10:00 a.m. to 3:30 p.m. on about half of the Sundays. He worked about 60 hours a week. The highest paid man working under Collopy received $2,786.80 in 1942, $2,932.38 in 1943 and $2,960.37 in 1944. He handled cost accounting and other duties. The officers of petitioner performed the duties assigned to them in an efficient *244 manner. Some of the duties performed by each would have been handled by employees in a larger organization. Petitioner's sales, net income, salaries, dividends, surplus and capital for the years 1928 to 1944, inclusive, were as follows: Net Income
Gross Sales,
before deduct-
Salaries
Surplus
Total
less
ing officers'
paid to
at end of
capital
Returns and
and Collopy's
officers and
Dividends
each year
and
Year
Allowances
Salaries
Collopy
paid
per Books
surplus
1928
$182,243.10
$ 42,358.70
$22,495.26
$ 18,677.98
$ 45,677.98
1929
256,574.01
67,048.24
37,500.00
45,002.89
72,002.89
1930
217,001.99
49,017.00
37,600.00
$ 2,700
52,575.98
79,575.98
1931
130,500.32
23,122.81
27,600.00
1,350
46,679.27
73,679.27
1932
51,971.49
3,859.70
14,550.00
35,500.73
60,500.73
1933
47,007.28
4,042.27
5,685.00
33,731.44
58,731.44
1934
123,964.80
16,205.27
10,850.00
37,954.48
62,954.48
1935
214,798.32
28,049.98
18,720.00
2,500
43,176.69
65,176.69
1936
374,045.11
69,365.36
40,000.00
25,000
43,446.00
68,446.00
1937
363,919.59
66,739.75
40,000.00
24,800
41,579.31
103,579.31
1938
236,593.04
28,784.23
33,000.00
36,718.38
114,218.38
1939
255,920.67
19,949.33
20,000.00
36,471.87
113,971.87
1940
279,514.46
40,133.65
33,000.00
42,055.65
119,555.65
1941
671,823.67
157,006.81
64,500.00
85,305.92
162,805.92
1942
671,610.36
173,504.35
74,000.00
7,750
106,870.10
184,370.10
1943
411,748.29
108,075.95
74,000.00
7,750
117,770.86
195,270.86
1944
439,875.66
130,243.81
74,000.00
7,750
132,472.95
209,972.95
*245 Reasonable compensation for the services rendered to the petitioner by its officers for each of the years 1942, 1943 and 1944 was as follows: Karl W. Schmidt
$15,500
H. G. Herrmann
12,000
B. C. Zwart
12,000
J. H. Collopy
10,000
Opinion The issue presented is whether the respondent erred in his determination that reasonable salaries for petitioner's officers, Karl W. Schmidt, H. G. Herrmann, B. C. Zwart and J. H. Collopy were $15,500, $12,000, $12,000, and $10,000, respectively, for each of the years 1942, 1943 and 1944, rather than $24,000, $17,500, $17,500, and $15,000 which were the amounts paid and deducted in petitioner's returns for each of these years. Petitioner has the burden of proving that the compensation paid was reasonable. In an attempt to sustain this burden, it was submitted for our consideration evidence showing, among other things, organization; stock ownership; gross sales; net income before and after deducting officers' salaries; dividends paid; additions to surplus; total capital and surplus for each of the years from the time of its organization in 1927 to and including the taxable years, and salaries paid to its officers during *246 this period. Each officer testified as to his education, business experience and the services he rendered to the petitioner. In addition, petitioner produced several witnesses who expressed opinions as to the ability and effciency of its officers. One banker who had made loans to petitioner from time to time expressed the opinion that, in a banker's appraisal of petitioner in connection with a bank loan during the taxable years, the compensation paid to Schmidt, Zwart and Herrmann, would be considered to be reasonable. All of this evidence, a substantial portion of which has been set forth in our findings, has received careful consideration. An examination of the minutes of the petitioner's board of directors, which are in evidence for the years 1928 to 1944 inclusive, discloses that it has been the consistent practice of the directors at their meetings usually held at the beginning of each year to discuss the business outlook and decide whether the salaries of its officers should be raised, reduced, or maintained at the existing rates. This examination convinces us that the factor which primarily influenced the directors in the consideration of this problem was the corporation's *247 ability to pay. When increases were voted, the minutes contained statements that "prospects for the coming year show that the Company is able to pay an increase of salary", "after some discussion of the outlook for business for the coming year it was decided that the salaries of the officers * * * should be increased", "the Company could look for better times", and "the Company would experience much better times in the near future." When reductions were voted, the minutes stated that "Business has been so slack this year and indications are that it will not be better for some time to come", that salaries paid were excessive "due to business conditions", and that it was necessary to "make some reduction in salaries and wages in order that the company maintain its present credit rating and good financial condition." In December 1941 and December 1942, when the directors voted bonuses to the officers, it was pointed out that these bonuses were to recompense the officers for excessive overtime necessary to keep up production. Petitioner is a close corporation and the same weight does not attach to salary allowances voted by the directors of such a corporation as attaches in instances *248 where officers have little or no financial interest in the corporation. Cf. , affd. sub nom ; . Where a close corporation is involved payments made to stockholder-officers as compensation for services will be carefully scrutinized to determine whether they in fact constitute a distribution of profits. The table set forth in our findings shows that during the years 1928 to 1944, inclusive, a very substantial proportion of the yearly earnings of petitioner, before deducting officers' salaries, was distributed to its officers in the form of salaries and that dividends were paid in only eight of these seventeen years. In the taxable years 1943 and 1944 more than fifty per cent of the net income before deducting officers' salaries was distributed as compensation to the officers, and in the taxable year 1942, slightly less than fifty per cent. Salaries paid in the prewar year 1940 were doubled and salaries paid in 1939 tripled. When, in this connection, the rather consistent policy of petitioner's *249 board of directors to measure compensation for its officers by the corporation's ability to pay, rather than by the value of the services rendered, is considered, there seems to us to be little doubt that there is merit in the respondent's argument that the purpose of the increases was to effect a distribution of earnings rather than to provide reasonable compensation for services rendered. The fact that the bonuses were voted at the end of each war year, when annual profits became known, supports this conclusion. The petitioner submitted evidence which established to our satisfaction that its officers were efficient and capable, well qualified by experience and training for the duties assigned to and performed by each; and that they worked considerable overtime during the taxable years when its plant was operating at capacity filling orders directly or indirectly connected with the war effort. We think it quite apparent from a study of all of the evidence, however, that the large volume of business done during the taxable years was attributable primarily to the impact of war and not to extraordinary efforts of petitioner's officers. This fact does not eliminate the necessity for *250 considering any actual additional burden placed upon petitioner's officers. . The best gauge as to what constitutes reasonable compensation for services, deductible under the statute as business expenses, is the amount which would ordinarily be paid for like services by like enterprises in like circumstances. . Petitioner introduced no evidence relating to salaries paid by competing concerns to their officers, and argues that there was no other concern which furnished its customers as a part of the price of its commodities the widest of experience and the highest of technical skill, and that, had there been competitors paying similar salaries for like services, evidence thereof would not have been available to it. We need not dwell upon whether or not petitioner could have ascertained whether or not its competitors paid similar salaries for like services. Suffice to say that evidence introduced by respondent discloses that petitioner and four competitors in the Kansas City area who fabricated and sold structural steel during the taxable years. The largest, the Kansas City Structural *251 Steel Co., was incorporated in 1907 and has been in business since that time. Its gross sales amounted to $6,316,859 in 1942, $6,219,820 in 1943, and $8,437,517 in 1944 as compared with sales of petitioner of $671,610.36 in 1942, $411,748.29 in 1943 and $439,875.66 in 1944. Its net income of $519,376 in 1942, $665,188 in 1943, and $842,546 in 1944 was greatly in excess of that of petitioner for the same years. At the beginning of 1942 it had a surplus of $397,887 and added thereto $210,674 in 1942, $274,205 in 1943 and $326,649 in 1944. Petitioner's surplus at the beginning of 1942 amounted to $85,305.92 and it added thereto $21,564.18 in 1942, $10,910.86 in 1943, and $14,702.09 in 1944. The Kansas City Structural Steel Co. paid dividends of $22,500 in 1942, $45,000 in 1943, and a dividend of $90,000 on its preferred outstanding stock in 1944, as compared with dividends of petitioner of $7,750 in each of the years 1942, 1943 and 1944. Whereas petitioner's officers owned substantially all of its outstanding stock, the officers of the Kansas City company owned approximately 1,100 of 7,500 shares of common stock and approximately 300 of 7,500 shares of preferred stock. The Kansas City *252 company paid its four officers total salaries of $45,175 in each of the years 1943 and 1944, and approximately $3,000 less than this amount in 1942. Petitioner paid its officers $74,000 for each of the years 1942, 1943 and 1944, and the respondent allowed $49,500. Petitioner argues that its officers worked longer hours, were more efficient and that they were entitled to more compensation for their services. The evidence indicates that they did work longer hours than the officers of their competitor, but in view of the wide disparity in results achieved, we would hesitate to say that they were more efficient and entitled to more compensation. The petitioner contends in his brief that comparison with the salary schedule of the Kansas City Structural Steel Co. is not proper because said company had a limitation on the amount of its allowable executive salaries as a result of the terms of a reorganization of said company under section 77 B of the Bankruptcy Act. Although the existence of such a limitation was flatly denied by the only witness testifying on this subject, we would hesitate, without specific additional testimony, to conclude that such a limitation, even if it existed, would *253 result in unreasonably small salaries. Petitioner also objects to comparison with the Kansas City Structural Steel Co. because that company limited its work to structural steel while the taxpayer produced both structural and ornamental steel. This distinction, if material to the amount of salaries paid, did not exist during the taxable years when petitioner confined its activities to structural steel. In his determination the respondent has allowed as reasonable compensation for petitioner's officers amounts which exceed those paid by petitioner to these officers in prewar years. The evidence introduced by petitioner does not convince us that these amounts do not constitute reasonable compensation for the services rendered. Our conclusion is therefore that the respondent's determination should be upheld and we have made a finding that his allowances of compensation for petitioner's officers for the taxable years were reasonable. Decision will be entered for the respondent.